UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Case No.  14-cv-3879-PJH

RACHEL MEHR, et al.,

        Plaintiffs,

    v.

FÉDERATION INTERNATIONALE DE
FOOTBALL ASSOCIATION, et al.,

        Defendants.

**ORDER GRANTING MOTIONS TO
DISMISS**

      Defendants' motions to dismiss the above-entitled action came on for hearing before this court on May 6, 2015.  Plaintiffs appeared by their counsel Steve W. Berman, Derek G. Howard, and Jon T. King.  Defendant Fédération Internationale de Football Association ("FIFA") appeared by its counsel Daniel H. Levi, H. Christopher Boehning, Michael J. Shepard, and Bruce Birenboim; defendant United States Soccer Federation, Inc. ("U.S. Soccer") appeared by its counsel Russell F. Sauer, Jr., Amy C. Quartarolo, and Casandra L. Thomson; defendant US Youth Soccer Association ("USYSA") appeared by its counsel Margaret M. Holm and M. Christopher Hall; defendant California Youth Soccer Association ("CYSA") appeared by its counsel Wallace M. Tice; defendants National Association of Competitive Soccer Clubs, Inc. d/b/a US Club Soccer ("US Club Soccer") and American Youth Soccer Organization ("AYSO") appeared by their counsel Stuart M. Gordon and Fletcher C. Alford; and

      Having read the parties' papers and carefully considered their arguments and the relevant legal authority, the court hereby GRANTS the motions as follows.

1

**BACKGROUND**

2      This proposed class action was filed on August 27, 2014 by seven soccer players,

3  four of whom are under 17 years of age.  The plaintiffs are Rachel Mehr ("Mehr"); R.K.I.,

4  by his mother Beata Ivanauskiene ("Ivanauskiene"); B.A., D.A., and I.A., by their mother

5  Sarah Aranda ("Aranda"); L.L.M., by her mother Karen Christine O'Donoghue

6  ("O'Donoghue"); and Kira Akka-Seidel ("Akka-Seidel").  R.K.I and Ivanauskiene live in

7  Illinois, as do B.A., D.A., I.A., and Aranda.  L.L.M. and O'Donoghue live in Colorado.

8  Mehr and Akka-Seidel both live in Northern California.

9      Each of the seven plaintiffs is or was a member of a local soccer club in his/her

10  community, and the claims asserted arise out of their participation in those local soccer

11  clubs.  Each of the local clubs is a member of a regional or state club or association,

12  which is a member of a national youth organization, which is in turn a member of US

13  Soccer, the United States member of FIFA.

14      Plaintiffs assert claims against FIFA and five national or regional organizations that

15  are engaged in promoting and sponsoring soccer, including youth soccer – US Soccer,

16  USYSA, CYSA, US Club Soccer, and AYSO.  Plaintiffs allege that "each of the

17  defendants has failed to provide adequate concussion management."  Cplt ¶ 29.  They

18  assert that defendants have failed to adopt and enforce rules that they claim would

19  reduce "the risk" of preventable injuries resulting from concussions and repetitive

20  heading, and they want the court to compel defendants to adopt and enforce rules that

21  would reduce that risk.  Cplt ¶ 28.  They further allege that FIFA has failed to modify the

22  FIFA "Laws of the Game" to provide proper protection from concussion injuries, as a

23  result of its "strict rules about the number of players that can be substituted."  Cplt ¶ 30.

24      Not all plaintiffs are suing all defendants.  Mehr is suing FIFA, AYSO, USYSA, and

25  US Club Soccer.  Cplt ¶ 38.  Plaintiffs allege that Mehr resides in Novato, California, and

26  that she played for "teams that were members of and governed by USYSA and US Club

27  Soccer" and played in "competitions hosted by USYSA and US Club Soccer."  Cplt ¶ 38.

28  Ivanauskiene on behalf of R.K.I. is suing FIFA and USYSA.  Cplt ¶ 41.  Plaintiffs allege

United States District Court
Northern District of California

that R.K.I. has played soccer in Arlington, Illinois, for the past three years with the Young Sportsman's Soccer League, a member of the Illinois Youth Soccer Association, which is in turn a member of USYSA.  Cplt ¶¶ 41, 42.  Aranda on behalf of B.A., D.A., and I.A. is suing FIFA, US Soccer, and AYSO.  Cplt ¶¶ 44, 46.  Plaintiffs allege that B.A., D.A., and I.A. have played AYSO soccer in DeKalb, Illinois.  Cplt ¶ 44.  Akka-Seidel is suing FIFA, USYSA, and US Soccer, Cplt ¶ 47, although plaintiffs assert in the opposition to US Club Soccer's motion that it was "clearly an oversight" to fail to allege that Akka-Seidel was also suing US Club Soccer.  Plaintiffs allege that Akka-Seidel resides in Larkspur, California, and last competed in soccer during the 2013 season for the University of California at Santa Cruz, under the FIFA Laws of the Game, and that she also played for the Mill Valley Soccer Club (affiliated with USYSA and US Club) and for the Tiburon Peninsula Soccer Club (affiliated with CYSA, USYSA, and US Soccer).  Cplt ¶ 47.  Finally, O'Donoghue on behalf of L.L.M. is suing FIFA, US Soccer, and AYSO.  Cplt ¶ 50.  Plaintiffs allege that L.L.M. played soccer for the Boulder Force Club in Colorado, a member of the Colorado Soccer Association, which is in turn a member of US Soccer.  Cplt ¶¶ 50-51.  None of the plaintiffs alleges any claims against CYSA, although they assert in their opposition that this was "perhaps an oversight" and that it should have been "readily apparent" from the complaint that Mehr and Akka-Seidel intended to sue CYSA.

|            | FIFA | US Soccer | USYSA | AYSO | US Club | CYSA |
|------------|------|-----------|-------|------|---------|------|
| Mehr       | x    |           | X     | x    | x       |      |
| R.K.I.     | x    |           | X     |      |         |      |
| B.A.       | x    | x         |       | x    |         |      |
| D.A.       | x    | x         |       | x    |         |      |
| I.A.       | x    | x         |       | x    |         |      |
| Akka-Seidel| x    | x         | X     |      |         |      |
| L.L.M.     | x    | x         |       | x    |         |      |

1

2    Plaintiffs' claims are asserted on behalf of a proposed class, but as the court

3    indicated at the hearing on the present motions, plaintiffs fail to make clear exactly whom

4    they seek to represent.  See May 6, 2015 Hearing Transcript ("5/6/15 Tr.") (Doc. 99) at

5    7-14.  Plaintiffs do not limit the proposed class by location, age of players, status of

6    players (professional or amateur – or within levels for amateur), or even reasonably by

7    relevant time period, instead proposing a class period extending back more than 13 years

8    from the date the complaint was filed, and a class including "[a]ll current or former soccer

9    players" who, during that 13-year period, "competed for a team governed by FIFA, the

10   United States Soccer Federation, U.S. Youth Soccer, American Youth Soccer

11   Organization, U.S. Club Soccer, or California Youth Soccer Association."  Cplt ¶ 415.

12   FIFA is based in Switzerland, and serves "as the governing body for soccer."  Cplt

13   ¶¶ 16, 19.  The members of FIFA include US Soccer and 208 other national soccer

14   federations from around the world.  Cplt ¶ 19.  FIFA organizes a limited number of

15   intercontinental soccer events (most notably the FIFA World Cup), but does not organize

16   any soccer leagues or tournaments on any level, including in the United States.  None of

17   the plaintiffs or their local clubs is a member of – or has any direct relationship with –

18   FIFA, and only US Soccer (of the named defendants) is a FIFA member.

19   US Soccer is "the governing body of soccer in all its forms in the United States."

20   Cplt ¶ 20; see also Cplt ¶ 72.  US Soccer has a number of "affiliates" or "members

21   consisting of youth, amateur, development, and professional leagues operating

22   throughout the United States."  Cplt ¶ 21.  USYSA is an "affiliate" of FIFA and is "the

23   largest member of" U.S. Soccer.  Cplt ¶¶ 23, 77.  In California, USYSA "affiliates" include

24   CYSA.  Cplt ¶ 23.  US Club Soccer is "an organization devoted to the development and

25   support of soccer clubs in the United States."  Cplt ¶¶ 27, 85.  AYSO is a "member" of US

26   Soccer.  Cplt ¶ 25.  US Soccer and US Club Soccer oversee both youth and adult soccer,

27   amateur and professional.  USYSA,  AYSO, and CYSA oversee youth soccer only.

28   Plaintiffs' 132-page complaint includes a lengthy section entitled "A Primer on

United States District Court
Northern District of California

4

United States District Court
Northern District of California

1   Concussions," Cplt ¶¶ 94-132, which is followed by another lengthy section entitled

2   "Consensus Best Practices for the Treatment of Concussions for the Period 2002-

3   Present," Cplt ¶¶ 133-194.  These "best practices" or "protocols" relate to concussion

4   management and treatment, and allegedly were developed following or in conjunction

5   with various international conferences, including four International Conferences on

6   Concussion in Sport held in Vienna, Prague, and Zurich, starting in 2001.  See Cplt ¶¶

7   229-247.  The complaint also quotes extensively from the FIFA "Statutes" regarding the

8   objectives of FIFA, the "Laws of the Game," and the "Members' Obligations," and also

9   quote various passages from FIFA's website, and from its "Medical Committee."  See

10  Cplt ¶¶ 195-218.

11       Plaintiffs assert that FIFA, US Soccer, and USYSA have "knowledge of consensus

12  best practices," but have "fail[ed] to adopt the consensus guidelines promulgated by the

13  international conferences on concussion in sport."  Cplt ¶¶ 229-260 (FIFA), ¶¶ 261-288

14  (US Soccer), ¶¶ 289-317 (USYSA).  They allege that prior to 2013, CYSA failed to "adopt

15  any consensus guidelines promulgated by the international conferences on concussions

16  in sport," and that its concussion protocol "still fails to adopt the consensus guidelines."

17  Cplt ¶¶ 349-374.  They assert that US Club Soccer has failed to "adopt any consensus

18  guidelines promulgated by the international conferences on concussions in sport."  Cplt

19  ¶¶ 344-348.  They claim that prior to 2009, AYSO failed to "adopt any consensus

20  guidelines promulgated by the international conferences on concussions in sport," and

21  that it has failed to adopt "consensus best practices."  Cplt ¶¶ 318-343.

22       Plaintiffs allege that each of the defendants has failed to adopt "proper rules for

23  protecting players under 17 from head injuries," Cplt ¶¶ 375-382; that FIFA has failed to

24  adopt "proper substitution rules to allow athletes to be evaluated during a game," Cplt

25  ¶¶ 383-407; that prior to the 2014 World Cup, plaintiffs and the class were "unaware that

26  the conduct of FIFA may have caused them to be at increased risk of developing chronic

27  brain injury symptoms, including but not limited to dementia and/or Alzheimer's disease

28  and chronic traumatic encephalopathy," Cplt ¶¶ 408-414.

1    Plaintiffs assert three causes of action on their own behalf and on behalf of the

2  members of the proposed class – (1) a claim of negligence; (2) a claim of "breach of

3  voluntary undertaking" (of the duty to "supervise, regulate, monitor, and provide

4  reasonable and appropriate rules to minimize the risk of injury to players"); and (3) a

5  claim of "medical monitoring" (brought "under the laws of the states in which [plaintiffs]

6  reside" and "under the laws of the states in which class members reside" although those

7  states of residence are not specified except as to the named plaintiffs).  Cplt ¶¶ 423-451.

8    Plaintiffs seek prospective injunctive relief.  Cplt ¶¶ 432, 443.  They also seek

9  "medical monitoring" as a remedy for defendants' alleged negligence, Cplt ¶¶ 433, 444,

10  and the establishment of a "medical monitoring program" funded by a trust fund to pay for

11  "medical monitoring of all past, current, and future FIFA athletes, as frequently and

12  appropriately as necessary," and which will provide information to athletes and treating

13  team physicians, Cplt ¶¶ 450, 451.

14    Before the court are (1) FIFA's motion to dismiss for lack of personal jurisdiction;

15  (2) FIFA's alternative motion to dismiss or compel arbitration (joined by US Soccer,

16  USYSA, and CYSA); (3) FIFA's motion to dismiss for failure to join a necessary party

17  (joined by US Soccer, USYSA, and CYSA); (4) FIFA's motion to dismiss for lack of

18  subject matter jurisdiction (joined by US Soccer, USYSA, and CYSA), US Soccer's

19  motion to dismiss for lack of subject matter jurisdiction (joined by USYSA, CYSA, US

20  Club Soccer, and AYSO), CYSA's motion to dismiss for lack of subject matter jurisdiction

21  (joined by US Soccer), US Club Soccer's motion to dismiss for lack of subject matter

22  jurisdiction (joined by US Soccer), and AYSO's motion to dismiss for lack of subject

23  matter jurisdiction (joined by US Soccer); and (5) FIFA's motion to dismiss for failure to

24  state a claim (joined by US Soccer, USYSA, and CYSA), US Soccer's motion to dismiss

25  for failure to state a claim (joined by USYSA, CYSA, US Club Soccer, and AYSO),

26  USYSA's motion to dismiss for failure to state a claim (joined by US Soccer), CYSA's

27  motion to dismiss for failure to state a claim (joined by US Soccer), US Club Soccer's

28  motion to dismiss for failure to state a claim (joined by US Soccer), and AYSO's motion to

1    dismiss for failure to state a claim (joined by US Soccer).

2    A.      Motion to Dismiss for Lack of Personal Jurisdiction

3           FIFA seeks an order dismissing the complaint for lack of personal jurisdiction,

4    arguing that it is not subject to either general or specific jurisdiction in this court.

5           1.      Legal Standard

6           When a defendant moves to dismiss a complaint for lack of personal jurisdiction,

7    the plaintiff bears the burden of demonstrating that the court may properly exercise

8    jurisdiction over that defendant.  See Picot v. Weston, 780 F.3d 1206, 2011 (9th Cir.

9    2015); Data Disc, Inc. v. Sys. Tech. Assoc. Inc., 557 F.2d 1280, 1285 (9th Cir. 1977).  In

10   resolving a motion to dismiss under Rule 12(b)(2) on written materials, the court accepts

11   uncontroverted facts in the complaint as true and resolves conflicts in affidavits in

12   plaintiff's favor.  Mavrix Photo, Inc. v. Brand Techs., Inc., 647 F.3d 1218, 1223 (9th Cir.

13   2011); Doe v. Unocal Corp., 248 F.3d 915, 922 (9th Cir. 2001).  Where the defendant's

14   motion is based on a written record and no evidentiary hearing is held, the plaintiff need

15   only make a prima facie showing of jurisdictional facts.  Picot, 780 F.3d at 2011.

16          The Due Process Clause of the Fourteenth Amendment "limits the power of a

17   state's courts to exercise jurisdiction over defendants who do not consent to jurisdiction."

18   Martinez v. Aero Caribbean, 764 F.3d 1062, 1066 (9th Cir. 2014).  A district court sitting

19   in diversity may exercise personal jurisdiction to the same extent as the courts of general

20   jurisdiction of the state in which it is located.  CollegeSource, Inc. v. AcademyOne, Inc.,

21   653 F.3d 1066, 1073 (9th Cir. 2011).  Because California's long-arm statute is

22   "coextensive with federal due process requirements, the jurisdictional analyses under

23   state law and federal due process are the same."  Id. (quotations and citations omitted);

24   see also Cal. Civ. P. Code § 410.10.

25          Due process requires that the defendant "have certain minimum contacts with it

26   such that the maintenance of the suit does not offend traditional notions of fair play and

27   substantial justice."  International Shoe Co. v. State of Wash., 326 U.S. 310, 315 (1945)

28   (quotations omitted).  Under the "minimum contacts" analysis, a court can exercise either

United States District Court
Northern District of California

7

"general or all-purpose jurisdiction," or "specific or conduct-linked jurisdiction." Daimler AG v. Bauman, 134 S. Ct. 746, 751 (2014) (citing Goodyear Dunlop Tires Operations, S.A. v. Brown, 131 S. Ct. 2846, 2851 (2011)); see Int'l Shoe, 326 U.S. at 316-20.

> 2.    FIFA's Motion

FIFA contends that it is not subject to either general or specific jurisdiction in California.  Plaintiffs argue that the court has personal jurisdiction over FIFA, but also request leave to conduct jurisdictional discovery in the event the court finds no personal jurisdiction.

Under general jurisdiction, a nonresident defendant may be subject to suit even on matters unrelated to his/her/its contacts with the forum.  Perkins v. Benguet Consol. Mining Co., 342 U.S. 437, 446 (1952); see Daimler, 134 S. Ct. at 754-58.  To establish general jurisdiction, the plaintiff must demonstrate that the defendant has continuous and systematic contacts sufficient to approximate physical presence in the state.  In re W. States Wholesale Natural Gas Antitrust Litig., 715 F.3d 716, 741 (9th Cir. 2013).

With regard to foreign corporations, the plaintiff must establish that the defendant corporation has "affiliations so continuous and systematic as to render [it] essentially at home in the forum State, . . . i.e., comparable to a domestic enterprise in that State." Daimler, 134 S. Ct. at 758 n.11 (citation omitted); see also Martinez, 764 F.3d at 1066. The standard is a "demanding one."  Martinez, 764 U.S. at 1070.  The paradigm fora for the exercise of general jurisdiction over a corporation are the place of incorporation and the principal place of business, and only in an "exceptional case" will general jurisdiction be available elsewhere.  Daimler, 134 S. Ct. at 760-61 & n.19.

FIFA argues that plaintiffs cannot make a prima facie showing of general jurisdiction, because they cannot show that FIFA is "at home" in California.  The court finds that FIFA has established that its contacts with California are not substantial enough to "approximate physical presence" in the state, and that under the standards articulated in Daimler and Goodyear it is therefore not subject to general jurisdiction.

It is undisputed that FIFA is a Swiss association registered in accordance with the

Swiss Civil Code, and that its principal place of business is in Zurich, Switzerland; and that the only members of FIFA are national associations such as US Soccer.  FIFA provides undisputed evidence showing that it has no office, no mailing address, and no employees or subsidiary in California; that it maintains no bank accounts and pays no taxes in California, maintains no distribution or manufacturing facilities in California, and maintains no agent for service of process in California; and that it is not registered to do business in California.

In the complaint, plaintiffs allege that FIFA has numerous contacts with California, but on closer review, it becomes clear that those contacts primarily relate to commercial or quasi-commercial activities that are no more numerous in California than in any other state (or possibly elsewhere in the world).  Indeed, FIFA's California contacts appear to be minor compared with its worldwide activities, and are certainly are not sufficient to render FIFA "essentially at home" in California.  See, e.g., Martinez, 764 F.3d at 1070. Moreover, at the hearing on the present motion, plaintiffs' counsel conceded that the court has no general jurisdiction over FIFA.  See 5/6/15 Tr. at 22-23.  Thus, the court turns to the question of specific jurisdiction.

A court may exercise specific jurisdiction over a defendant if his/her/its less substantial contacts with the forum gave rise to the claim or claims pending before the court – that is, if the cause of action "arises out of" or has a substantial connection with that activity.  Hanson v. Denckla, 357 U.S. 235, 250-53 (1958); see Goodyear, 131 S. Ct. at 2854.  The inquiry into whether a forum state may assert specific jurisdiction over a nonresident defendant focuses on the relationship among the defendant, the forum, and the litigation.  Walden v. Fiore, 134 S. Ct. 1115, 1121 (2014).

In the Ninth Circuit, specific jurisdiction is analyzed using a three-part test:  First, the nonresident defendant must have purposefully directed his activities or consummated some transaction with the forum or a forum resident, or performed some act by which he purposefully availed himself of the privilege of conducting activities in the forum, thereby invoking the benefits and protections of its laws; second, the claim must be one which

1    arises out of or relates to the nonresident defendant's forum-related activities; and third,

2    the exercise of jurisdiction must comport with fair play and substantial justice, i.e., it must

3    be reasonable.  See Picot, 780 F.3d at 1211.  If the plaintiff is successful at establishing

4    the first two prongs, the burden shifts to the defendant to set forth a compelling case that

5    the exercise of jurisdiction would not be reasonable.  Id. at 1211-12.

6         The first prong of the test is analyzed under either a "purposeful availment"

7    standard or a "purposeful direction" standard, which are two distinct concepts.

8    Washington Shoe Co. v. A-Z Sporting Goods Inc., 704 F.3d 668, 672 (9th Cir. 2012).

9    Generally for claims sounding in contract, courts apply a "purposeful availment" analysis,

10   asking whether the defendant has "purposefully avail[ed]" itself of "the privilege of

11   conducting activities within the forum State, thus invoking the benefits and protections of

12   its laws."  Schwarzenegger v. Fred Martin Motor Co., 374 F.3d 797, 802 (9th Cir. 2004)

13   (quoting Hanson, 357 U.S. at 253); see Picot, 780 F.3d at 1212.

14        For claims sounding in tort, courts generally apply a "purposeful direction" test,

15   looking to evidence that the defendant has directed his actions at the forum state, even if

16   those actions took place elsewhere.  Schwarzenegger, 374 F.3d at 802-03.  To establish

17   purposeful direction, the plaintiff show that the defendant committed an intentional act,

18   expressly aimed at the forum state, causing harm that the defendant knows is likely to be

19   suffered in the forum state.  Dole Food Co., Inc. v. Watts, 303 F.3d 1104, 1111 (9th Cir.

20   2002) (citing Calder v. Jones, 465 U.S. 783, 788-89 (1984)).  In some cases, the Ninth

21   Circuit has limited the "purposeful direction" test to claims involving intentional torts.  See

22   Holland America Line Inc. v. Wärtsilä North America, Inc., 485 F.3d 450, 460 (9th Cir.

23   2007) ("[I]t is well established that the Calder [purposeful direction] test applies only to

24   intentional torts, not to the breach of contract and negligence claims[.]"); but c.f., Menken

25   v. Emm, 503 F.3d 1050, 1059 (9th Cir. 2007) (applying Calder purposeful direction test to

26   claims of negligence, wrongful interference with contractual relations, civil extortion, and

27   fraudulent recording of document because they are all claims that sound in tort).

28        Here, plaintiffs assert two causes of action – a claim of negligence, and a claim of

United States District Court
Northern District of California

"voluntary undertaking."[1]  Because California law provides that recovery on a theory of negligent undertaking requires proof of the elements of any negligence cause of action, see Artiglio v. Corning, Inc., 18 Cal. 4th 604, 614-15 (1998), the purposeful availment standard provides the proper analysis (at least based on Holland America and its progeny).

FIFA asserts that it is not subject to specific jurisdiction in California under the three-part test.  With regard to the first prong of the test, FIFA argues for application of the "purposeful direction" standard, and argues that plaintiffs cannot show that it purposefully directed its acts towards the residents of California.  FIFA does not provide any discussion beyond asserting that the first prong of the test for specific jurisdiction requires a showing of purposeful direction.

Plaintiffs argue in their opposition brief that FIFA has performed numerous acts by which it purposefully availed itself of the privilege of conducting activities in California, thereby invoking the benefits and protections of its laws, and that the allegations of these facts are sufficient to establish the first prong of the three-part test.  Plaintiffs contend that FIFA requires its members, such as US Soccer, to "follow FIFA's rules and the Laws of the Game" and also requires the members of its members (i.e., US Soccer's members) to follow those rules and laws.  They also assert that Northern California has the largest concentration of youth soccer players in the country.

Plaintiffs argue further that FIFA has the power to influence individuals in California and throughout the United States, "including consciously acting as a major influence on children in matters such as concussion related-issues."  In particular, plaintiffs point to allegations in the complaint regarding the establishment of a "FIFA Medical Center of Excellence" in Santa Monica in 2007, pointing to materials on FIFA's website that extol the positive aspects of this sports medicine facility.  Plaintiffs also contend that FIFA also has "authorized agents" in California, including in this judicial

---

[1]  Plaintiffs also allege a third cause of action – a claim for "medical monitoring" – which as explained below is not a viable cause of action.

United States District Court
Northern District of California

district, who operate as "match agents" to arrange matches between FIFA-sanctioned teams here and elsewhere.  They claim that FIFA has numerous other contacts with California – including sponsoring the finals of the "FIFA Interactive World Cup of 2011" – a worldwide videogame presentation, as well as sponsoring videogame competitions in California at various times.

In addition, in the complaint, plaintiffs assert that FIFA engages in a variety of "commercial activities in the U.S. and California."  The allegations generally relating to the United States are that a 2014 TV advertisement for Dick's Sporting Goods showed high school students using a FIFA-branded soccer ball, Cplt ¶ 56; that FIFA announced in 2005 that ABC and Univision had been awarded rights for all FIFA events from 2007 to 2014, Cplt ¶ 64; that Electronic Arts stated in a 2014 SEC filing that it had entered into a video-game licensing agreement with FIFA, Cplt ¶ 65; that FIFA-branded toys are sold at Toys-R-Us and in other stores "around the country," Cplt ¶ 66; that FIFA runs full-page ads for products directed at children, and advertises on Facebook, Twitter, and YouTube, Cplt ¶ 67; and that FIFA has an official online store, with a mailing address in North Carolina, which states that it welcomes orders from the "USA," Cplt ¶¶ 68-70.  None of these allegations appears to have the remotest connection to California, and thus are irrelevant for purposes of the personal jurisdiction analysis.

The allegations with some (tenuous) connection to California are that FIFA has "numerous licensing agreements" for products intended to be sold and distributed in California," Cplt ¶ 57; that Coca-Cola issued a press release in 2014 announcing that it was partnering with FIFA to bring the World Cup trophy to four cities in the United States including Los Angeles, Cplt ¶ 58; that in 2011, FIFA sponsored a worldwide videogame competition in California, Cplt ¶ 59; that in 2007, FIFA announced it was setting up "FIFA Medical Centres of Excellence" across all continents, and that it presented a doctor in California, with an "official accreditation certificate" for the Santa Monica Orthopaedic and Sports Medicine Group," Cplt ¶ 60; that in 2003, FIFA hosted the Women's World Cup in the United States, with one of the venues and "numerous matches" played in California,

1   Cplt ¶ 61; that FIFA has filed copyright and trademark infringement suits in California and

2   Oregon, Cplt ¶ 62; that FIFA has entered into broadcasting and advertising/branding

3   agreements relating to the U.S. market, including the California market, Cplt ¶ 63; and

4   that FIFA has "authorized agents" in the Northern District of California, including two in

5   San Francisco, who allegedly have authority to arrange for "matches" between "FIFA-

6   sanctioned teams," Cplt ¶ 71.

7       At best, plaintiffs have made a weak showing of purposeful availment.  This

8   requirement assures that a nonresident will be aware that it is subject to suit in the forum

9   state, and that it can then take steps to limit the costs of litigation there or can sever its

10  connections with the forum state.  See World-Wide Volkswagen Corp. v. Woodson, 444

11  U.S. 286, 297 (1980).  The foreseeability of causing injury in the forum state is not

12  enough by itself to subject a nonresident defendant to jurisdiction there.  Id. at 295; see

13  also Walden, 134 S. Ct. at 1123.  Rather, "the foreseeability that is critical to due process

14  analysis . . . is that the defendant's conduct and connection with the forum state is such

15  that [it] should reasonably anticipate being haled into court there."  World-Wide

16  Volkswagen, 444 U.S. at 297; see also Walden, 134 S. Ct. at 1122 (minimum contacts

17  analysis "looks to the defendant's contacts with the forum state itself, not defendant's

18  contacts with persons who reside there").

19      Here, the allegation that FIFA requires its members, such as US Soccer, to "follow

20  FIFA's rules and the Laws of the Game" and also requires the members of its members

21  (i.e., US Soccer's members) to follow those rules and laws, even if true, could be said of

22  almost any location in the United States.  Even when combined with the fact that there

23  are many youth soccer players in Northern California, this allegation is not sufficient to

24  show that FIFA has availed itself of the privilege of conducting activities within California,

25  such that it should have reasonably anticipated being haled into court in this state.  Nor is

26  the allegation that FIFA has the "power to influence individuals in California and

27  throughout the United States" sufficient to show that FIFA has purposefully availed itself

28  of the privilege of conducting activities in California, thereby invoking the benefits and

United States District Court
Northern District of California

13

1   protections of its laws.  To find otherwise would be to suggest that FIFA is subject to

2   personal jurisdiction everywhere in the United States where soccer is played.

3          The allegation that FIFA has provided the Director of the Santa Monica

4   Orthopaedic and Sports Medicine Group an "official accreditation certificate, and that it

5   announced an intention to set up "FIFA Medical Centres of Excellence" across "all

6   continents" to assure that "all players have access to high quality football medicine" does

7   not clearly establish a strong connection with California such that FIFA should have

8   anticipated being haled into court to defend itself in this forum.  FIFA provides evidence

9   showing that there are more than 40 such independent centers across the globe, and that

10  three are located in the United States.  However, FIFA does not own the Santa Monica

11  Medical Group, does not pay the salaries of its employees, and received no financial

12  consideration for the accreditation.

13         Similarly, the allegations that FIFA has "agents" located in California who arrange

14  matches between FIFA-sanctioned teams in California and "elsewhere," and that it has

15  sponsored videogame competitions in California do not show that FIFA has purposefully

16  availed itself of the privilege of conducting activities in California.  FIFA has provided

17  evidence showing that the match "agents" have no responsibility within FIFA and are not

18  compensated by FIFA, and that their state of residence is irrelevant to the arranging of

19  matches under license to FIFA.

20         The allegations that FIFA has entered into various commercial arrangements or

21  agreements, while somewhat vague, do arguably support a finding of some low level of

22  purposeful availment.  However, the court finds it unnecessary to engage in a

23  comprehensive analysis of the "purposeful availment" prong, because plaintiffs cannot

24  satisfy the second prong of the specific jurisdiction test – that the claims asserted in the

25  complaint arise out of or relate to FIFA's forum-related activities.

26         This prong requires a showing of "but for" causation – that is, a showing that the

27  claims would not have arisen but for FIFA's contacts with the forum.  See Doe, 248 F.3d

28  at 924-25.  Here, FIFA contends, plaintiffs cannot show that their claims would not have

United States District Court
Northern District of California

arisen "but for" FIFA's contact with California.  Indeed, FIFA argues, plaintiffs do not allege that their claims arise from any specific FIFA forum-related activity, and to the extent there are allegations regarding FIFA's contacts with California, they are limited to allegations relating to contacts of a commercial nature that are unrelated to claims based on FIFA's alleged failure to implement concussion-related protocols.

Nevertheless, plaintiffs assert in their opposition that their claims arise out of FIFA's California-related activities.  They point to the allegation that FIFA "requires its members" (including US Soccer) to follow FIFA's rules and the Laws of the Game; and to various documents in which FIFA has emphasized its worldwide role and influence, including in the area of "youth issues" and "medical issues."  They also note that defendant AYSO is based in Torrance, California, and is bound to follow FIFA's rules.  In addition, they assert, FIFA has "chosen" to locate its medical care, research and education center in Santa Monica, and identifies on its website a "medical committee," one of the members of which is located in Santa Monica.  Finally, they claim that FIFA recently announced its intention to build a soccer facility in Carson, California.

The court finds that FIFA's motion to dismiss for lack of personal jurisdiction must be GRANTED.  As plaintiffs have conceded that there is no general jurisdiction over FIFA, the only question is whether the court has specific jurisdiction.  The gist of the jurisdictional allegations in the complaint is that FIFA "exerts massive worldwide influence and regulation over all aspects of soccer, including in the United States and in California[;]" that it "engages in a broad swath of commercial activities in the U.S. and in California, strategically reinforcing its 'brand' and its primacy in the world of soccer and entrenching its influence[;]" and that it "has extracted, and continues to extract, massive sums of money from the U.S. and California, and has not contributed to protecting the safety of the youth players to which it markets and influences."  Cplt ¶ 56.

Plaintiffs have failed to show that their claims would not have arisen "but for" FIFA's contact with the forum.  See Doe, 248 F.3d at 923-34.  Plaintiffs seek an injunction compelling changes to the Laws of the Game to require enactment of concussion

United States District Court
Northern District of California

1   management protocols, mandate substitution rules that allow for medical evaluation

2   without penalty, and mandate limits on heading – in practices and games – by players

3   under 17.  They also seek an order requiring FIFA to establish and fund medical

4   monitoring programs, apparently for all youth soccer players in the United States.

5   However, they never articulate how their claims would not have arisen "but for" the

6   alleged contacts between FIFA and California.  Nor can plaintiffs meet that standard,

7   because none of the alleged contacts have anything to do with the implementation of

8   concussion management protocols, or more generally with the enactment of the Laws of

9   the Game by non-party International Football Association Board ("IFAB"), which is the

10  only body with authority to enact or modify the Laws of the Game.[2]

11          Plaintiffs point to the Santa Monica Sports Medicine Group, the existence of FIFA

12  match agents, and FIFA's worldwide video game sponsorship as the primary bases for

13  the court to find specific jurisdiction, they fail to explain how these activities relate in any

14  way to their claims, which center on the theory that they are subject to a risk of

15  concussions from playing soccer.

16          As for the Medical Centres, there are more than 40 such centers around the world

17  (three in the U.S.) that have been accredited by FIFA.  FIFA has provided evidence

18  showing that it does not own, control, or operate the centers; that it does not pay the

19  salaries of or provide benefits for the Santa Monica Centre's employees; that no FIFA

20  employees work at the Santa Monica Centre; and that there is no financial consideration

21  exchanged for the accreditation.  The accredited institutions are totally independent of

22  FIFA, and much of their work has nothing to do with FIFA or with soccer.

23          As for the match agents, the evidence shows that match agents are not

24  employees or agents of FIFA – rather, they hold licenses that allow them to arrange

25  _____

26  [2]   As set forth in FIFA's motion to dismiss for failure to join a necessary party, the sole
responsibility for the Laws of the Game lies with IFAB, a body that convenes once a year

27  to discuss the Laws.  IFAB is composed of FIFA (with four votes) and the four British
associations (England, Scotland, Wales, and Northern Ireland) with one vote apiece).

28  Thus, FIFA, with its four votes, cannot unilaterally modify the Laws.  IFAB is a Swiss
organization that does no business in the United States.

1    matches between national teams or clubs from different confederations.  Moreover, their

2    location is irrelevant, as a match agent with an office in California can arrange matches

3    anywhere.  These agents have no responsibility within FIFA, or on behalf of FIFA in

4    California. They are not compensated by FIFA, and have no authority to bind FIFA.  They

5    are responsible for obtaining their own professional liability insurance.

6         As for the other activities alleged in the complaint – the FIFA Interactive World

7    Cup, the World Cup Trophy Tour, and the FIFA Development Committee – none of these

8    activities are related to plaintiffs' claims in this lawsuit and thus plaintiffs cannot show that

9    "but for" the contacts, their claims would not have arisen.

10        FIFA has provided evidence showing that it does not stage or organize any

11   continental, national, regional, or local soccer matches in California, and that in the only

12   alleged instances in which it has participated as an organizer of sport (the 2003 Women's

13   World Cup), only 6 of 32 matches were played in California.  However, the complaint

14   alleges no facts showing that plaintiffs participated in those matches, that they were

15   playing soccer at that time, and that their so-called injury (risk of concussions) would not

16   have occurred but for FIFA's activity in the forum.  Nor is the presence in California of

17   one member of FIFA's medical committee, sufficient to confer specific jurisdiction over

18   the claims in this case, as there are no allegations that plaintiffs' alleged injury would not

19   have occurred "but for" that contact with California.

20        The court does not reach the third prong of the specific jurisdiction test – whether

21   the exercise of jurisdiction would be reasonable – as the burden shifts to FIFA only if

22   plaintiffs are able to satisfy the first two prongs of the test.  See Doe, 248 F.3d at 925.

23        Finally, the court finds no basis for allowing plaintiffs to conduct jurisdictional

24   discovery.  A district court has "broad discretion" to permit or deny discovery to aid in

25   determining whether it has personal jurisdiction.  See Butcher's Union Local No. 498 v.

26   SDC Inv., Inc., 788 F.2d 535, 540 (9th Cir. 1986); see also Boschetto v. Hansing, 539

27   F.3d 1011, 1020 (9th Cir. 2008); Data Disc, 557 F.2d at 1285 n.1.  Discovery should

28   ordinarily be granted where "pertinent facts bearing on the question of jurisdiction are

17

1   controverted or where a more satisfactory showing of the facts is necessary." <u>Laub v.</u>

2   <u>U.S. Dep't of Interior</u>, 342 F.3d 1080, 1093 (9th Cir. 2003) (citations omitted).

3        In this district, courts have generally held that "a plaintiff need not make out a

4   prima facie case of personal jurisdiction before it can obtain jurisdictional discovery."

5   <u>See</u>, <u>e.g.</u>, <u>Corcera Sols., LLC v. Razor, Inc.</u>, 2014 WL 587869 at *2-3 (N.D. Cal. Feb. 14,

6   2014); <u>Calix Networks, Inc. v. Wi-Lan, Inc.</u>, 2010 WL 3515759, at *4 (N.D. Cal. Sept. 8,

7   2010).  Where further discovery on an issue "might well" demonstrate facts sufficient to

8   constitute a basis for jurisdiction, it is an abuse of discretion to deny it.  <u>Harris Rutsky &</u>

9   <u>Co. Ins. Serv. v. Bell & Clements</u>, 328 F.3d 1122, 1135 (9th Cir. 2003).

10       However, denial of discovery "is not an abuse of discretion when it is clear that

11   further discovery would not demonstrate facts sufficient to constitute a basis for

12   jurisdiction." <u>Wells Fargo & Co. v. Wells Fargo Express Co.</u>, 556 F.2d 406, 430 n.24 (9th

13   Cir. 1977); <u>see also</u> <u>Martinez</u>, 764 F.3d at 1070.  "[W]here a plaintiff's claim of personal

14   jurisdiction appears to be both attenuated and based on bare allegations in the face of

15   specific denials made by the defendants, the Court need not permit even limited

16   discovery." <u>Pebble Beach Co. v. Caddy</u>, 453 F.3d 1151, 1160 (9th Cir. 2006) (quotations

17   and citation omitted).

18       Plaintiffs concede that the court does not have general jurisdiction, yet the

19   discovery they seek appears aimed almost entirely at establishing general jurisdiction –

20   <u>e.g.</u>, information regarding business or potential business conducted by FIFA in

21   California, including advertising, marketing, and sales; communications by FIFA

22   employees with individuals in California; and training and seminars conducted by FIFA in

23   California, attended by California residents.  Nevertheless, independent of plaintiffs'

24   concession, it is clear that plaintiffs cannot show that FIFA is "at home" in California, as it

25   is a Swiss association with its principal place of business in Zurich, Switzerland, and has

26   no employees, office, mailing address, agent for service of process, bank accounts, or

27   distribution or manufacturing facilities in California, pays no taxes in California, and is not

28   registered to do business in California.  Thus, any discovery relating to FIFA's general

United States District Court
Northern District of California

commercial activities in California would be irrelevant to the issue of general jurisdiction.

Moreover, as explained above, plaintiffs provide no evidence supporting specific jurisdiction, let alone any "colorable basis," as they have not shown that their claims would not have arisen "but for" FIFA's contacts with California.  Plaintiffs' request for jurisdictional discovery is premised on "little more than a hunch that it might yield jurisdictionally relevant facts."  Boschetto, 539 F.3d at 1020.  They have established no connection between any claim asserted in this case and any action by FIFA in California, and have provided no indication as to what discovery might possibly demonstrate facts sufficient to constitute a basis for jurisdiction.

B.     Motions to Dismiss for Lack of Subject Matter Jurisdiction

FIFA (joined by US Soccer, USYSA, and CYSA) argues that the complaint should be dismissed for lack of Article III standing, because plaintiffs fail to allege facts showing injury-in-fact, causation, or redressability.  In addition, US Soccer (joined by USAYA, CYSO, US Club, and AYSO), and CYSA, US Club Soccer, and AYSO (all joined by US Soccer) argue that plaintiffs lack standing to seek the relief requested in the complaint.

1.     Legal Standard

Federal courts are courts of limited jurisdiction, possessing only that power authorized by Article III of the United States Constitution and statutes enacted by Congress pursuant thereto.  See Bender v. Williamsport Area Sch. Dist., 475 U.S. 534, 541 (1986).  Thus, federal courts have no power to consider claims for which they lack subject-matter jurisdiction.  See Wang ex rel. United States v. FMC Corp., 975 F.2d 1412, 1415 (9th Cir. 1992).  The court is under a continuing duty to dismiss an action whenever it appears that it lacks jurisdiction.  Billingsley v. C.I.R., 868 F.2d 1081, 1085 (9th Cir. 1989); see also Spencer Enters., Inc. v. United States, 345 F.3d 683, 687 (9th Cir. 2003); Attorneys Tr. v. Videotape Comput. Prods., Inc., 93 F.3d 593, 594-95 (9th Cir. 1996).

Standing is a jurisdictional limitation.  It is "an essential and unchanging part of the case-or-controversy requirement of Article III."  Lujan v. Defenders of Wildlife, 504 U.S.

555, 560 (1992); see also Arizona State Legislature v. Ariz. Indep. Redistricting Comm'n, ___ S. Ct. ___, 2015 WL 2473452 at *8 (U.S. June 29, 2015).  Standing is not subject to waiver, and must be considered by the court even if the parties fail to raise it.  See United States v. Hays, 515 U.S. 737, 742 (1995).  Each plaintiff bears the burden of establishing that he/she has standing for each claim and for each form of relief claimed.  See DaimlerChrysler Corp. v. Cuno, 547 U.S. 332, 352 (2006); see also Hays, 515 U.S. at 743 (burden is on party seeking exercise of jurisdiction to "clearly . . . allege facts demonstrating that he is a proper party to invoke judicial resolution of the dispute").

To qualify as a party with standing to litigate, a plaintiff must show injury in the form of "invasion of a legally protected interest" that is "concrete and particularized" and "actual and imminent," and which is also "fairly traceable to the challenged action" and "redressable by a favorable ruling."  Arizona State Legislature, 2015 WL 2473452 at *8 (quotations and citations omitted); see also Clapper v. Amnesty Int'l USA, 133 S. Ct. 1138, 1147 (2013); Lujan, 504 U.S. at 560-61.

2.       Defendants' Motions

Defendants argue that plaintiffs do not meet the case-or-controversy requirement for Article III standing, because they fail to show an injury-in-fact that is fairly traceable to the conduct of a specific defendant, and which is redressable by the relief sought in the complaint, and fail to establish standing to seek the remedies of prospective injunctive relief and retrospective medical monitoring.  In an alternative argument, defendants assert that California law disfavors judicial intervention into the rights and duties of private voluntary associations, and that this court accordingly should decline to exercise subject matter jurisdiction over this dispute.

With regard to the first factor, defendants contend that none of the seven plaintiffs alleges any present injury.  One of the seven (L.L.M.) alleges that she suffered a single concussion in 2013, which was not caused by "heading" a ball.  See Cplt ¶ 52.  Each of the seven plaintiffs pleads a variation of a single allegation – that he/she is "at increased risk of latent brain injuries caused by repeated head impacts or the accumulation of

United States District Court
Northern District of California

concussive and/or subconcussive hits in [his/her] soccer career and therefore is in need of medical monitoring." See Cplt ¶ 40 (Mehr), ¶ 43 (R.K.I.), ¶ 46 (B.A., D.A., I.A.), ¶ 49 (Akka-Seidel), ¶ 52 (L.L.M.).  Defendants argue that plaintiffs have failed to allege a fear of future injury that is immediate or direct, and that the allegations in the complaint thus fail to satisfy the injury-in-fact requirement.

With regard to the second factor, defendants assert that the complaint alleges no facts showing even a weak causal connection between any act or omission by a specific defendant, and any particular injury to a specific plaintiff.  Defendants also contend that while IFAB – a distinct entity that FIFA does not control – has the sole power to enact the Laws of the Game, the Laws of the Game can be modified (by regional or local leagues) in their application to youth and female players, and are flexibly implemented by each of soccer's governing bodies.

With regard to the third factor, defendants argue, first, that where a party necessary to afford the requested relief is not a party to the suit, a court decision cannot provide plaintiffs with the relief they seek.  See Lujan, 504 U.S. at 561.  Thus, they assert, to the extent that plaintiffs are seeking an order altering the FIFA Laws of the Game, such relief is not available because the sole party with the power to implement changes to the Laws of the Game is IFAB, which is not subject to personal jurisdiction in California.

In addition, defendants assert that plaintiffs lack standing to seek either the remedy of prospective injunctive relief or the remedy of retrospective medical monitoring. With regard to prospective injunctive relief, they assert that six of the seven plaintiffs (Mehr, B.A., D.A., I.A., Akka-Seidel, and L.L.M.) do not allege that they are currently playing soccer or that they intend to play soccer, and that the seventh plaintiff (R.K.I.) has not alleged that he faces an imminent threat of harm that is not purely speculative or hypothetical; that the over-17 plaintiffs (Mehr, Akka-Seidel, and L.L.M.) are out of the age-range for seeking modifications to rules governing youth soccer; that the under-17 plaintiffs have not alleged facts showing any imminent risk of injury that is fairly traceable to any defendant; that there is no justiciable controversy as to the Substitution Rule, as

1    plaintiffs have conceded that the rule is inapplicable to them; and that the allegation that

2    plaintiffs might suffer concussions in the future is too speculative to confer standing to

3    seek implementation of concussion management protocols or rules.  With regard to

4    medical monitoring, defendants contend that none of the plaintiffs alleges any injury that

5    is fairly traceable to defendants' conduct, for which medical monitoring could provide a

6    remedy.

7         In opposition, plaintiffs assert that they have adequately alleged standing.  They

8    point to allegations that each plaintiff has played soccer on teams subject to the rules and

9    control of various defendants, Cplt ¶¶ 38-39 (Mehr), ¶¶ 41-42 (R.K.I.); ¶¶ 44-45 (B.A.,

10   D.A., I.A.), ¶¶ 47-48 (Akka-Seidel), ¶¶ 51-51 L.L.M.); that each plaintiff has been

11   "damaged by the actions and inactions of each of the [d]efendants," Cplt ¶ 54; that all

12   plaintiffs "play soccer and are at risk due to [d]efendants' breaches [of duty]," Cplt ¶¶ 430,

13   441; that as a result of the actions and inactions of all defendants, all plaintiffs "have an

14   improper risk of injury caused by the misconduct of the [d]efendants," Cplt ¶¶ 431, 442;

15   and that each plaintiff "is at increased risk of latent brain injuries caused by repeated

16   head impacts as well as the accumulation of concussive and subconcussive hits,

17   particularly as minors, in their soccer careers and therefore is in need of medical

18   monitoring," Cplt ¶¶ 40, 43, 46, 49, 51.

19        Plaintiffs contend that they have adequately pled both actual and "prospective"

20   harm.  They argue that defendants' suggestion that plaintiffs never headed a ball "strains

21   plausibility" and ignores the allegations.  They cite Cplt ¶ 52, where they allege that

22   L.L.M. "was hit in the head when someone kicked the ball and fell to the ground."  They

23   contend that "[t]he notion that [p]laintiff Seidel, a premier and college player, did not head

24   the ball is non surgical [sic] to anyone who has watched the game."

25        Plaintiffs also complain that defendants are seeking to hold them to a heightened

26   pleading standard, which standard they argue has been "rejected" by the Supreme Court.

27   Plaintiffs assert that they are required to plead only a "short and plain statement of the

28   claim" showing that they are entitled to relief, and that there is no requirement to plead

injury resulting from defendants' conduct in any detail.

The motion is GRANTED.  Under Lujan, plaintiffs are required to allege an injury that is "concrete and particularized" and "actual or imminent, not 'conjectural' or 'hypothetical.'"  See id., 504 U.S. at 560.  The injury alleged by the plaintiff must be "concrete in both a qualitative and temporal sense."  Whitmore v. Arkansas, 495 U.S. 149, 155 (1990).  "Past exposure to illegal conduct does not in itself show a present case or controversy regarding injunctive relief . . . if unaccompanied by any continuing, present adverse effects."  O'Shea v. Littleton, 414 U.S. 488, 495-96 (1974); see also Mayfield v. United States, 599 F.3d 964, 970 (9th Cir. 2010) (plaintiff must show "real and imminent threat that he will be wronged again in the same way).  Moreover, allegations of speculative or "possible future" injury do not satisfy the Article III requirement.  See id. at 157-58; see also Clapper, 133 S. Ct. at 1147.

A plaintiff seeking injunctive relief satisfies the requirement of redressability by alleging facts showing that he/she is "realistically threatened by a repetition of the violation."  Gest v. Bradbury, 443 F.3d 1177, 1181 (9th Cir. 2006).  Plaintiffs allege no facts showing that any of them is realistically threatened by a repetition of any violation. The facts showing standing must be clearly apparent on the face of the complaint.  Baker v. United States, 722 F.2d 517, 518 (9th Cir. 1983); see also Schmier v. U.S. Court of Appeals, 279 F.3d 817, 821 (9th Cir. 2002) (party seeking to invoke jurisdiction of federal court must allege "specific facts sufficient to satisfy" the elements of standing).  "A federal court is powerless to create its own jurisdiction by embellishing otherwise deficient allegations of standing."  Whitmore, 495 U.S. at 155-56.  "[S]tanding cannot be inferred argumentatively from averments in the pleadings."  FW/PBS, Inc. v. City of Dallas, 493 U.S. 215, 231 (1990).

Here, the complaint is replete with vague and conclusory allegations of "injuries" and "harm" supposedly inflicted by "all defendants" on "all plaintiffs," but plaintiffs have alleged no facts showing that Mehr, R.K.I., B.A., D.A., I.A., or Akka-Seidel has been injured or is in any imminent danger of injury.  Plaintiffs assert that each of the seven

United States District Court
Northern District of California

1    plaintiffs played youth soccer and is at "increased risk of latent brain injuries," having

2    sustained "repeated head impacts" and/or "concussive" or "subconcussive hits" during

3    his/her soccer "career," and is therefore in need of "medical monitoring."  Cplt ¶¶ 40, 43,

4    46, 49, 52.  Nevertheless, only L.L.M. is alleged to have suffered an actual concussion –

5    on one occasion – and even here, plaintiffs have not alleged any facts showing that

6    L.L.M. is in imminent danger of injury, as they assert the same vague and conclusory

7    allegation with regard to L.L.M. as with regard to the other six plaintiffs.  See Cplt ¶ 52.

8    As pled in the complaint, the alleged "risk" of latent brain injuries is speculative and

9    nebulous, rather than being "certainly impending" such that it constitutes a real and

10   immediate injury-in-fact.  See Whitmore, 495 U.S. at 158.

11       As for plaintiffs' frivolous argument that defendants are improperly seeking to

12   impose a "heightened pleading standard," and that they are not required to plead injury

13   resulting from defendants' conduct in any detail, the court notes that Lujan, which

14   plaintiffs cite in support of this argument, clearly holds that because the elements of

15   standing are "not mere pleading requirements but rather an indispensable part of the

16   plaintiff's case," each of those elements "must be supported in the same way as any

17   other matter on which the plaintiff bears the burden of proof."  Id. at 561.  Thus, at the

18   pleading stage, plaintiffs are required to allege the elements of standing with at least as

19   much specificity as is required in pleading the elements of a cause of action.  See Perez

20   v. Nidek Co., Ltd., 711 F.3d 1109, 1113 (9th Cir. 2013) (quoting Ashcroft v. Iqbal, 556

21   U.S. 662, 678 (2009)).

22       The complaint is jurisdictionally defective for the further reason that plaintiffs have

23   alleged no facts showing any causal connection between the conduct of any specific

24   defendant and any alleged injury to a particular plaintiff.  Even as to the one plaintiff

25   (L.L.M.) alleged to have sustained a concussion, plaintiffs allege no facts showing that

26   any defendant was responsible for L.L.M.'s concussion or was even made aware of it.

27   Nor do plaintiffs allege any facts showing that the vaguely described "repeated head

28   impacts" and/or "concussive" or "subconcussive hits" suffered by any particular plaintiff

1    were the result of some action taken by a particular defendant.

2         Finally, the court finds that plaintiffs have not alleged facts sufficient to

3    demonstrate redressability.  Plaintiffs seek an injunction requiring defendants to draft and

4    adopt unspecified concussion management protocols and to change the rules by which

5    soccer is played.  They also seek creation of a monetary fund of unspecified size to pay

6    for medical monitoring of some untold number of players and former players in the United

7    States and perhaps worldwide who fall within the proposed class as defined in the

8    complaint.  Defendants argue that plaintiffs lack Article III standing to seek either

9    prospective injunctive relief or retrospective relief in the form of medical monitoring.

10        As stated above, each plaintiff bears the burden of establishing that he/she has

11   standing for each claim and for each form of relief claimed.  See DaimlerChrysler, 547

12   U.S. at 352.  Essentially, the analysis of whether plaintiffs have standing to seek the

13   remedies they seek collapses into the analysis of redressability, which requires that

14   plaintiff show that it is likely, as opposed to merely speculative, that his/her injuries can

15   be redressed by a favorable ruling from the court.  Lujan, 504 U.S. at 560-61; see Allen v.

16   Wright, 468 U.S. 737, 753 n.19 (1984).

17        It is not entirely clear what prospective injunctive relief plaintiffs are seeking.  In the

18   portion of the complaint entitled "Introduction," plaintiffs assert that they are seeking, on

19   behalf of themselves and the broadly-defined class of "all current or former soccer

20   players" who at any time from 2002 to the present, played soccer for a team "governed

21   by" FIFA, US Soccer, USYSA, AYSO, or US Club, an injunction requiring each defendant

22   to "(1) mandate the enactment and enforcement of proper concussion-management

23   practices and return-to-play guidelines; (2) mandate substitution rules that allow for

24   medical evaluation without penalty; and (3) mandate limits on heading by players under

25   17."  Cplt ¶ 32.

26        In the portion of the complaint entitled "Parties," plaintiffs assert that they seek

27   "class-wide injunctive or equitable relief in the form of changes to [FIFA, US Soccer,

28   USYSA, US Club Soccer, and AYSO] rules and practices with respect to concussion

United States District Court
Northern District of California

United States District Court
Northern District of California

1   management, return-to-play guidelines, and limitations on heading in order to meet the

2   consensus best practices" allegedly outlined elsewhere in the complaint.  Cplt ¶ 40

3   (Mehr), ¶ 43 (R.K.I.), ¶ 46 (B.A., D.A., I.A.), ¶ 49 (Akka-Seidel), ¶ 53 (L.L.M.).

4           In the allegations supporting the first and second causes of action, plaintiffs assert

5   that they are entitled to "injunctive relief requiring each Defendant, among other things, to

6   adopt corrective measures regarding: the implementation of system-wide 'return to play'

7   guidelines for the screening and detection of head injuries; failing to implement

8   substitution Rules for medical evaluation purposes and failing to regulate heading by

9   players under 17."  Cplt ¶¶ 432, 443.

10          The court's best guess prior to the hearing on the present motions was that

11  plaintiffs, on behalf of the class as defined in the complaint, were seeking modifications to

12  the FIFA Laws of the Game to limit the number of player substitutions permitted ("the

13  FIFA Substitution Rule"), unspecified "changes" to organization "rules and practices with

14  respect to concussion management [and] return-to-play guidelines," and changes to rules

15  that allow "heading," with a goal of imposing some "limitations on heading" by players

16  younger than 17; and that they were also seeking implementation of a program of

17  medical monitoring for themselves and all class members.

18          At the hearing, plaintiffs' counsel for the first time indicated that plaintiffs were

19  seeking the prospective injunctive relief in the form of changes to the substitution rules,

20  concussion management and return-to-play guidelines, and restriction or elimination of

21  heading only with respect to players under 17, and were seeking the retrospective

22  medical monitoring for all individuals who had ever played soccer under the auspices of

23  one of the defendant organizations at any time since 2002.  5/6/15 Tr. at 72-74.

24  However, with specific regard to changes to heading rules, plaintiffs' counsel also stated,

25  "14 to 17 we don't seek [to] ban heading at all, the basic limitation on how much you hit"

26  and that they were seeking "potentially, again based on discovery, that there be no

27  heading perhaps under age 14, or that it be limited, there can be a limited number of

28  times you can hit."  5/6/15 Tr. at 71.

26

United States District Court
Northern District of California

As an initial matter, to the extent that plaintiffs seek injunctive relief in the form of an order directing changes to the FIFA Laws of the Game, such relief is unavailable because the only entity with the authority to change the Laws of the Game is IFAB, a Swiss organization that is not a party to this action, and over which the court would not have personal jurisdiction even were it named as a defendant.

Further, none of the plaintiffs alleges that he/she faces an imminent threat of irreparable harm that is not purely speculative or hypothetical. Plaintiffs appear to have conceded that they lack standing with regard to the modification to the FIFA Substitution Rule. None of the plaintiffs alleges that he/she currently plays for, has ever played for, or otherwise intends to play for a youth organization that enforces the Substitution Rule. In light of plaintiffs' counsel's statement at the hearing that plaintiffs are seeking prospective injunctive relief only as to players of youth soccer, plaintiffs' concession in the complaint that "the FIFA substitution rule is not followed at the youth level" dooms that part of the claim. See Cplt ¶ 383.

As for implementation of system-wide concussion management and return-to-play guidelines, and the restrictions on heading by players younger than 17, plaintiffs have also not established that they have standing to seek those forms of relief. Six of the seven plaintiffs alleged they "played" soccer, not that they currently play soccer. See Cplt ¶ 38 (Mehr), ¶ 44 (B.A., D.A., I.A.), ¶ 47 (Akka-Seidel), ¶ 50 (L.L.M.). Moreover, three of the seven plaintiffs (Mehr, Akka-Seidel, and L.L.M.) are 17 or older, and thus are out of age-range for rule changes pertaining to youth soccer.

Most importantly, however, none of the plaintiffs have standing to seek an order compelling adoption of the "Consensus Statement" or "best practices" recommendations as defined by plaintiffs, because the assertion that they might suffer concussions in the future and that such concussions might be exacerbated in the absence of their proposed concussion management protocols does not show any "real and imminent threat" of a repetition of an alleged violation and is thus too speculative to confer standing. No plaintiff that does not claim to have suffered a concussion can seek to hold defendants

1    liable for any alleged failure to implement plaintiffs' proposed concussion management

2    protocols, let alone for returning him/her to play despite the awareness of his/her

3    condition by an individual affiliated with a particular defendant.

4        Finally, plaintiffs lack standing to impose limits on heading, even as to those

5    players who are under 17, because they do not allege that they suffered injury as a result

6    of heading or attempting to head a soccer ball.  (Based on counsel's statements at the

7    hearing, it appears that plaintiffs are not seeking limits on heading for any players 14 and

8    older.)  Moreover, none of the plaintiffs alleges that he/she ever engaged in repetitive

9    heading, much less engaged in it at the levels plaintiffs speculate may be later

10   determined to cause injury.

11       In the absence of allegations that each plaintiff engaged in repetitive heading of a

12   soccer ball or was returned to play prematurely after suffering a concussion (the

13   symptoms of which were made evident to an individual affiliated with a defendant),

14   plaintiffs have failed to meet their burden of establishing standing to challenge any failure

15   by defendants to restrict heading or any alleged failure to implement concussion

16   management protocols.

17       With regard to retrospective medical monitoring, none of the plaintiffs has standing

18   to seek this form of relief because none alleges that he/she suffered an actual injury that

19   is fairly traceable to defendants' challenged conduct, for which medical monitoring could

20   provide a remedy.  A plaintiff seeking the remedy of medical monitoring in California must

21   show "that the need for future monitoring is a reasonably certain consequence of the

22   plaintiff's toxic exposure and that the recommended monitoring is reasonable."  Potter v.

23   Firestone Tire & Rubber Co., 6 Cal. 4th 965, 974 (1993).

24       Here, one plaintiff (L.L.M.) claims to have suffered a concussion, but the complaint

25   presents this concussion as a one-time event, the symptoms of which have fully resolved,

26   and plaintiffs have alleged no facts showing that L.L.M. sustained any injury that gives

27   rise to a need for medical monitoring.  Nor do plaintiffs allege that any individual affiliated

28   with any specific defendant was aware that L.L.M. was exhibiting symptoms of

United States District Court
Northern District of California

concussion, or that the concussion was exacerbated by defendants' alleged lack of sufficient concussion management protocols (or that it was caused by "heading" a ball).

Finally, the court finds it unnecessary to rule on defendants' alternative proposal that the court decline to exercise subject matter jurisdiction under a theory of abstention. The court notes that in general, abstention (of any sort) is the exception and not the rule. See Colorado River Water Conserv. Dist. v. United States, 424 U.S. 800, 813 (1976); see also Chula Vista Citizens for Jobs & Fair Competition v. Norris, 782 F.3d 520, 528 *4 (9th Cir. 2015). Also, given the lack of facts to support the claims, the court would be reluctant to find that it should abstain on the ground argued by defendants.

D.     Motion to Dismiss for Failure to State a Claim

FIFA (joined by US Soccer, USYSA, and CYSA) seeks an order dismissing the complaint for failure to state a claim, as do US Soccer (joined by USYSA, CYSA, US Club Soccer, and AYSO), USYSA (joined by US Soccer), CYSA (joined by US Soccer), US Club Soccer (joined by US Soccer) and AYSO (joined by US Soccer).

1.     Legal Standard

A motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) tests for the legal sufficiency of the claims alleged in the complaint. Ileto v. Glock, Inc., 349 F.3d 1191, 1199-1200 (9th Cir. 2003). Review is generally limited to the contents of the complaint, although the court can also consider a document on which the complaint relies if the document is central to the claims asserted in the complaint, and no party questions the authenticity of the document. See Sanders v. Brown, 504 F.3d 903, 910 (9th Cir. 2007). To survive a motion to dismiss for failure to state a claim, a complaint generally must satisfy only the minimal notice pleading requirements of Federal Rule of Civil Procedure 8, which requires that a complaint include a "short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2)

A complaint may be dismissed under Rule 12(b)(6) for failure to state a claim if the plaintiff fails to state a cognizable legal theory, or has not alleged sufficient facts to support a cognizable legal theory. Somers v. Apple, Inc., 729 F.3d 953, 959 (9th Cir.

2013).  While the court is to accept as true all the factual allegations in the complaint, legally conclusory statements, not supported by actual factual allegations, need not be accepted.  Iqbal, 556 U.S. at 678-79; see also In re Gilead Scis. Sec. Litig., 536 F.3d 1049, 1055 (9th Cir. 2008).

The allegations in the complaint "must be enough to raise a right to relief above the speculative level[,]" and a motion to dismiss should be granted if the complaint does not proffer enough facts to state a claim for relief that is plausible on its face.  Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 555, 558-59 (2007) (citations and quotations omitted).  A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  Iqbal, 556 U.S. at 678 (citation omitted).  "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged – but it has not 'show[n]' – 'that the pleader is entitled to relief.'"  Id. at 679.  Where dismissal is warranted, it is generally without prejudice, unless it is clear the complaint cannot be saved by any amendment.  Sparling v. Daou, 411 F.3d 1006, 1013 (9th Cir. 2005).

2.      Defendants' Motions

All seven defendants seek an order dismissing the complaint, arguing that plaintiffs fail to state a claim as to any of their three causes of action, each of which is brought on behalf of "[p]laintiffs and the class."

a.      Negligence

As pled, the first cause of action for negligence does not present a coherent legal claim.  First, plaintiffs allege that "each defendant" acted negligently in its position as a regulatory body for soccer and soccer players, including plaintiffs and the members of the class.  Cplt ¶ 425.  Next, plaintiffs assert that FIFA and US Soccer "knew or should have known that their actions or inactions in light of the rate and extent of concussions reported and made known to FIFA and US Soccer would cause harm to players in both the short- and long-term[;]" Cplt ¶ 425; and that they "knew that through the power of the

1  Laws of the Game they had the power to direct and influence how the rest of the

2  defendants treat concussion management issues[,]" Cplt ¶ 426.  Added to this, they

3  assert that the "non-FIFA and US Soccer [d]efendants had an independent duty to enact

4  and enforce Laws of the Game that properly protect players."  Cplt ¶ 427.

5      Plaintiffs allege further that "[e]ach [d]efendant was careless and negligent by

6  breaching the duty of care it assumed for the benefit of the [p]laintiffs and the Class, both

7  generally and in the following particular respects" – in failing to educate players and their

8  parents concerning symptoms that may indicate a concussion has occurred; in failing to

9  warn of the risk of unreasonable harm (including long-term complications and cognitive

10 decline) resulting from repeated concussions and return-to-play, the accumulation of

11 subconcussive hits, and heading; in failing to promulgate rules and regulations to

12 adequately address the dangers of repeated concussions and accumulation of

13 subconcussive hits; and in  concealing and misrepresenting pertinent facts that players

14 and parents needed to be aware of to make determinations of the safety of return to play.

15 Cplt ¶ 428.

16     They add that "[i]t was reasonable and foreseeable to FIFA and US Soccer that

17 their failures would flow downstream to the Rules and Laws of the Game enacted by

18 other organizations, including the other [d]efendants in this action."  Cplt ¶ 429.  Finally,

19 they allege that "[a]s a result of the foregoing, the [p]laintiffs and the Class have an

20 improper risk of injury caused by the misconduct of the [d]efendants."  Cplt ¶ 430.

21     Defendants contend that the negligence claim must be dismissed because

22 plaintiffs have not pled facts sufficient to show either a breach of a legally cognizable

23 duty, or causation.  As for the alleged failure to implement the recommendations or

24 guidelines in the Consensus Statements, defendants argue that none of them have a

25 relationship with plaintiffs such that they would be under any duty to enforce those

26 recommendations or guidelines.  In addition, they note that the Consensus Statements

27 state they are not intended to be a standard of care, and argue that in the absence of a

28 legal duty owed to plaintiffs, plaintiffs cannot establish that any duty was breached.

1   As for the alleged duty to prevent risks of concussions and other injuries,

2   defendants assert that under the rule stated by the California Supreme Court in <u>Knight v.</u>

3   <u>Jewett</u>, 3 Cal. 4th 296 (1992), there is no duty to prevent risks that are inherent in a sport,

4   but rather only a duty not to increase the risks to a participant over and above those

5   inherent in the sport.  Defendants note that plaintiffs allege elsewhere in the complaint

6   that "[i]njuries are an unfortunate part of soccer" (and thus, presumably, an "inherent"

7   risk); that at least 30% of concussions in soccer are caused by "heading the ball," or

8   "attempting to head the ball and colliding with a player, object, or the ground," and that

9   "[p]urposefully heading the ball is a legal and encouraged maneuver" in soccer.  <u>See</u> Cplt

10  ¶¶ 2, 6, 12.

11  Defendants argue that plaintiffs have alleged no facts showing that any defendant

12  has done anything to increase the risks of the sport beyond those already inherent in the

13  game.  Moreover, defendants assert, because there are no allegations showing any

14  connection between any actions taken by any specific defendant and any injury suffered

15  by any plaintiff, plaintiffs have failed to plead that any action by any defendant is the

16  proximate cause of plaintiffs' alleged injuries.

17  In their opposition to defendants' motion, plaintiffs complain that defendants have

18  "strayed away from the dominant theme of the [c]omplaint," which plaintiffs characterize

19  as the claim that defendants have "failed to enact and enforce best practices for

20  concussion management."  According to plaintiffs, "[t]his is an issue about what happens

21  after a concussion or likely concussion occurs."  Plaintiffs claim that defendants are

22  missing the point when they cite "inapposite cases solely focusing on an activity itself, not

23  medical care issues that occur after the activity."

24  The court finds that the motion must be GRANTED.  The elements of a claim of

25  negligence under California law are (1) duty; (2) breach; (3) causation; and (4) damages.

26  <u>Wells Fargo Bank, N.A. v. Renz</u>, 795 F.Supp. 2d 898, 924-25 (N.D. Cal. 2011) (citing

27  <u>Ileto</u>, 349 F.3d at 1203).  As pled, the first cause of action alleges no facts showing that

28  any defendant breached any legal duty of care owed to any plaintiff.

1    The existence of a legal duty is the threshold element of a cause of action for

2   negligence.  Friedman v. Merck & Co., 107 Cal. App. 4th 454, 463 (2003).  Whether this

3   essential prerequisite to a negligence cause of action has been satisfied in a particular

4   case is a question of law to be resolved by the court.  Avila v. Citrus Comty Coll. Dist., 38

5   Cal. 4th 148, 161 (2006); Artiglio, 18 Cal. 4th at 614.  As a general rule, persons have a

6   duty to use due care to avoid injury to others, and may be held liable if their careless

7   conduct injures another person.  See Rowland v. Christian, 69 Cal. 2d 108, 112-13

8   (1968); Cal. Code § 1714.  A duty of care may arise through statute, contract, the general

9   character of the activity, or the relationship between the parties.  The Ratcliff Architects v.

10  Vanir Constr. Mgmt., Inc., 88 Cal. App. 4th 595, 604-05 (2001) (citing J'Aire Corp. v.

11  Gregory, 24 Cal. 3d 799, 803 (1979)).

12    In California, the controlling case on the existence of legal duty in the sports

13  context – where "conditions or conduct that might otherwise be viewed as dangerous

14  often are an integral part of the sport itself" – is Knight v. Jewett.  In that case, the

15  California Supreme Court held that there is no duty to prevent risks that are "inherent in

16  the sport itself," and that the duty owed by a defendant depends on the defendant's role

17  or relationship to the sport.  Id., 3 Cal. 4th at 317-18.  While the issue in Knight was the

18  proper duty of care governing the liability of a sports participant for an injury to a co-

19  participant, the general principle is applicable to determining the existence of a duty of

20  care here.

21    Indeed, courts have applied the doctrine to defendants who were not co-

22  participants, such as ski resort operators, see Connelly v. Mammoth Mt. Ski Area, 39 Cal.

23  App. 4th 8, 12-14 (1995) (resort operator had no duty to pad ski lift tower because

24  collisions with ski lift towers, other skiers, and snow-making equipment are inherent risks

25  of the sport); and baseball league organizers, see Balthazor v. Little League Baseball,

26  Inc., 62 Cal. App. 4th 47, 51 (1998) (Little League owed no duty to player to provide

27  special safety equipment to guard against being struck by wild ball, because that is

28  inherent risk of sport).

United States District Court
Northern District of California

United States District Court
Northern District of California

1       Here, plaintiffs have acknowledged that "injuries" are a "part of soccer."  See Cplt

2  ¶ 2.  They have also conceded that "heading," which they claim causes at least 30% of

3  the concussions in soccer – thus, by implication, also conceding that 70% of concussions

4  are due to some other cause – is "a legal and encouraged maneuver" in soccer.  See

5  Cplt ¶¶ 6, 12.  A defendant has no duty to protect a plaintiff against risks inherent in a

6  particular sport voluntarily played by the plaintiff, since those who participate in a sporting

7  activity that poses an inherent risk of injury generally assume the risk that they may be

8  injured while doing so.  See Lackner v. North, 135 Cal. App. 4th 1188, 1197-99 (2006).

9       Under California law, "a failure to alleviate a risk cannot be regarded as

10 tantamount to increasing that risk."  Paz v. State of California, 22 Cal. 4th 550, 560

11 (2000).  Plaintiffs have alleged no basis for imputing to any defendant a legal duty to

12 reduce the reduce the risks inherent in the sport of soccer, or to implement any of the

13 "Consensus Statement" guidelines or concussion management protocols, and have

14 alleged no facts showing that any defendant took any action that increased the risks

15 beyond those inherent in the sport.

16      In addition, to plead actual or legal causation, a plaintiff must allege facts showing

17 that the defendant's act or omission was a substantial factor in bringing about an injury

18 suffered by the plaintiff.  See Saelzler v. Advanced Grp., 25 Cal. 4th 763, 778 (2001).  In

19 this case, however, plaintiffs have alleged no facts showing that any plaintiff suffered any

20 injury – including a concussion – as a result of an allegedly negligent act by any

21 defendant.   Rather, the gist of plaintiffs' negligence claim is that in failing to promulgate

22 rules and regulations relating to concussion management, each defendant "breached the

23 duty of care it assumed for the benefit" of each of the plaintiffs, with the result that

24 plaintiffs "have an improper risk of injury due to [d]efendants' breaches."  As stated above

25 in the discussion of the motion to dismiss for lack of subject matter jurisdiction, the

26 allegations of injury are vague, conclusory, and entirely speculative, rather than concrete

27 and particularized, and just as those allegations are insufficient to establish plaintiffs'

28 entitlement to sue, they are insufficient to support a cause of action for negligence.

b.      Voluntary undertaking

In the second cause of action cause of action for voluntary undertaking, plaintiffs assert that "each [d]efendant voluntarily assumed a duty toward [p]laintiffs and the Class to supervise, regulate, monitor, and provide reasonable and appropriate rules to minimize the risk of injury to the players." Cplt ¶ 435.  They assert that each defendant was negligent in breaching its "assumed and voluntary duty of due care for the benefit of [p]laintiffs and the Class," both generally and by failing to educate players and their parents concerning symptoms that may indicate a concussion has occurred; in failing to warn of the risk of unreasonable harm (including long-term complications and cognitive decline) resulting from repeated concussions and return-to-play, the accumulation of subconcussive hits, and heading; in failing to promulgate rules and regulations to adequately address the dangers of repeated concussions and accumulation of subconcussive hits; and in  concealing and misrepresenting pertinent facts that players and parents needed to be aware of to make determinations of the safety of return to play. Cplt ¶ 439.

Defendants contend that the second cause of action fails to state a claim because plaintiffs have pled no facts showing that any defendant voluntarily assumed a duty with regard to the subject matter of the complaint.  US Soccer, USYSA, AYSO, and US Club Soccer each filed a motion (as did CYSA, against which no claim is asserted by any plaintiff in the case), and US Soccer, USYSA, AYSO, and US Club also each join in FIFA's motion to dismiss, which the court does not specifically discuss here because it has determined that it has no personal jurisdiction over FIFA.

The court finds that the motions must be GRANTED.  Under negligence principles, a person generally has no duty to protect another from harm in the absence of a special relationship or custody or control.  See Nally v. Grace Cmty Church, 47 Cal. 3d 278, 293 (1988).  However, under California law, a volunteer who, having no initial duty to do so, undertakes to provide protective services to another, will be found to have a duty to exercise due care in the performance of the undertaking if (1) the volunteer's failure to

exercise such care increases the risk of harm to the other person, or if (2) the other

person reasonably relies upon the volunteer's undertaking and suffers injury as a result.

See Delgado v. Trax Bar and Grill, 36 Cal. 4th 224, 249 (2005); see also Rickley v.

Goodfriend, 212 Cal. App. 4th 1136, 1156-57 (2013) ("A defendant who enters upon an

affirmative course of conduct affecting the interests of another is regarded as assuming a

duty to act, and will be liable for negligent acts or omissions, because one who

undertakes to do an act must do it with care.") (citations and quotations omitted); 6

Witkin, Summary of Cal. Law (10th ed. 2005) Torts, § 1060 ("A person not required to

perform services for another may sometimes do so in a voluntary or gratuitous

undertaking, and in that case, is under a duty to exercise due care in performance.")

(citing cases).

The "Good Samaritan" rule is "firmly rooted in the common law of negligence."

Artiglio, 18 Cal. 4th at 613. "The foundational requirement of the [G]ood Samaritan rule is

that in order for liability to be imposed upon the actor, he must specifically have

undertaken to perform the task he is charged with having performed negligently, for

without the actual assumption of the undertaking there can be no correlative duty to

perform that undertaking carefully." Id. at 614-15 (quoting Blessing v. United States, 447

F.Supp. 1160, 1188-89 (E.D. Pa. 1978)). The Good Samaritan law and the voluntary

undertaking doctrine are premised on a limited duty. Baker v. City of Los Angeles, 188

Cal. App. 3d 902, 907 (1986) ("The duty of a 'good Samaritan' is limited. Once he has

performed his voluntary act he is not required to continue to render aid indefinitely.").

i.     US Soccer

B.A., D.A., I.A., Akka-Seidel, and L.L.M. assert claims against US Soccer. They

allege, based on statements on US Soccer's website, that US Soccer "has knowledge of

consensus best practices." See Cplt ¶ 261. They also assert that US Soccer has

created a "Concussion Management Program" to provide education, evaluation, and

management of concussions among "national team players;" and a "Concussion Testing

and Management Process," which includes baseline testing, emergency evaluation of

1    athletes, procedures for field evaluation and removal of players from participation if a

2    concussion is suspected, post-concussion neurological tests, and a graded return-to-play

3    protocol.  Cplt ¶ 263.  They contend that US Soccer has failed to adopt the consensus

4    guidelines promulgated by the "International Conferences on Concussion in Sport," which

5    appear to incorporate most if not all of the practices and procedures US Soccer has

6    adopted as part of its Concussion Management Program.  See Cplt ¶¶ 264-288.

7         US Soccer does not address the first and second causes of action separately, but

8    instead argues that both causes of action should be dismissed because plaintiffs fail to

9    plead facts showing that it breached a duty it owed to them.  More particularly, US Soccer

10    argues that it had no legal duty to enforce the recommendations in the Consensus

11    Statements or to change the Laws of the Game or restrict heading, and that it did not

12    assume such a duty.  US Soccer points to the allegation in the second cause of action

13    that it "voluntarily assumed a duty toward [p]laintiffs and the Class to supervise, regulate,

14    monitor, and provide reasonable and appropriate rules to minimize the risk of injury to the

15    players," Cplt ¶ 435, but argues that broad statements and generalizations about US

16    Soccer's role in the sport and references to its enforcement of the Laws of the Game are

17    not enough to establish a voluntary undertaking. US Soccer also argues that plaintiffs'

18    claim is barred by the doctrine of primary assumption of the risk.

19         In opposition, plaintiffs point to allegations in the complaint that US Soccer has a

20    duty to take measures to prevent concussions or limit their effects, arising from its role as

21    the "governing body of soccer in all its forms in the United States," see Cplt ¶¶ 20, 22;

22    and that US Soccer breached this duty by failing to mandate its Concussion Management

23    Program beyond elite athletes to all participants, failing to mandate return-to-play

24    protocols, failing to implement best practices in managing concussions in children under

25    13 and baseline testing at all levels, and failing to require proper on-site medical

26    personnel to manage concussions, see Cplt ¶¶ 264-268, 272-283.  Plaintiffs assert that

27    because US Soccer has undertaken broad responsibility for setting and enforcing the

28    Laws of the Game, and because it has the power to direct and influence how the rest of

United States District Court
Northern District of California

37

1   the defendants treat concussion management issues, it assumed a duty to protect

2   plaintiffs and the members of the class.

3           The court finds that the facts as alleged are insufficient to support a claim of

4   voluntary undertaking against US Soccer.  In creating a "Concussion Management

5   Program" for national team players, US Soccer did not voluntarily assume a duty to adopt

6   or enforce the consensus guidelines drafted by the various International Conferences on

7   Concussion in Sport, or to change the Laws of the Game or other unspecified rules

8   relating to any aspect of the game.  Plaintiffs have identified no facts in their opposition

9   that support a claim that US Soccer has specifically undertaken to take actions to

10   eliminate risks inherent in the sport of soccer or to reduce the risk of injury from improper

11   concussion management.

12                       ii.       USYSA

13           Mehr, R.K.I., and Akka-Seidel assert claims against USYSA. They allege, based

14   on USYSA's adoption of a "Concussion Procedure and Protocol" for its US Youth Soccer

15   National Championship Series, that USYSA "has knowledge of consensus best

16   practices."  Cplt ¶ 289-290.  They also assert that USYSA failed to adopt any consensus

17   guidelines (including its own protocol) for members or tournaments other than the

18   Championship Series tournament – and for that tournament, fails to adopt the consensus

19   guidelines (such as baseline testing, emergency evaluation of athletes, procedures for

20   field evaluation and removal of players from participation if a concussion is suspected,

21   post-concussion neurological tests, and a graded return-to-play protocol) – and at most,

22   simply provides informational links on its website.  Cplt ¶¶ 291-316.  They allege that

23   USYSA's failure to implement or require various consensus best practices for concussion

24   management of children and adolescents "is in contravention of best practices."  Cplt

25   ¶ 317.

26           USYSA argues that plaintiffs cannot establish that it assumed a duty to implement

27   and enforce recommendations contained in the consensus statements, and that, as

28   argued by US Soccer, plaintiffs assumed a risk of injury by continuing to play soccer,

United States District Court
Northern District of California

United States District Court
Northern District of California

1    thereby precluding any legal duty on the part of USYSA to prevent such risks.  USYSA

2    notes that under <u>Artiglio</u>, the defendant must specifically have undertaken to perform the

3    task he/she/it is charged with having performed negligently, and that without such a

4    voluntary assumption of the undertaking, there can be no correlative duty to perform that

5    undertaking carefully.  USYSA also argues that plaintiffs have failed to plead any facts

6    showing that it is the proximate cause of any injuries suffered by plaintiffs relating to

7    concussion management.

8         In opposition, plaintiffs contend that the complaint adequately alleges that USYSA

9    has undertaken "broad responsibility in setting and enforcing the Laws of the Game," and

10   that it performed this duty negligently, by "failing to educate" players and parents about

11   concussion symptoms, by "failing to warn" of the harm that might result from repeated

12   concussions, by "failing to disclose" the risks of long-term complications from repeated

13   concussions, by "concealing and misrepresenting pertinent facts" regarding concussions.

14   <u>See</u> Cplt ¶ 439.  As for USYSA's argument regarding proximate cause, plaintiffs contend

15   that this argument is "fact-based" and "speculative," and should be disregarded.  They

16   claim that USYSA has not pointed to any "public policy" that would shield it from liability

17   for its "negligence."

18        The court finds that the facts as alleged are insufficient to support a claim of

19   voluntary undertaking against USYSA.  Plaintiffs have identified no facts in their

20   opposition that support a claim that USYSA has specifically undertaken to take actions to

21   eliminate risks inherent in the sport of soccer or to reduce the risk of injury from improper

22   concussion management.  Nor have plaintiffs identified facts showing that USYSA

23   specifically assumed an obligation to change the Laws of the Game or other unspecified

24   rules pertaining to the game, or to restrict heading.

25                              iii.   AYSO

26        Mehr, B.A., D.A., I.A., and L.L.M. assert claims against AYSO.  Plaintiffs allege

27   that prior to 2009, AYSO failed to adopt any of the consensus guidelines drafted by the

28   International Conferences on Concussion in Sport (including return-to-play guidelines,

1   prohibition on return-to-play after sustaining a concussion, and providing education of

2   athletes, colleagues, those working with athletes, and the general public).  Cplt ¶ 318.

3   They allege further that in 2009, AYSO implemented a "national policy statement"

4   regarding concussion awareness and safety, and also partnered with the CDC to create a

5   Concussion Action Plan for coaches.  Cplt ¶¶ 319-321.  However, they assert that

6   AYSO's Concussion Action Plan remains deficient because it fails to adopt the

7   consensus "best practices" of the International Conferences.  Cplt ¶¶ 322-342.  They

8   allege that AYSO's failure to implement or require various consensus best practices for

9   concussion management of children and adolescents is "in contravention of best

10  practices."  Cplt ¶ 343.

11          AYSO contends that plaintiffs' claims fail for lack of duty, although it does not

12  address the first and second causes of action separately.  Citing to US Soccer's motion,

13  AYSO asserts that a defendant owes no duty to a plaintiff who is allegedly injured as a

14  result of a risk inherent in a sporting activity, and that here, plaintiffs have pled no facts

15  showing that it owed them any legal duty to minimize risks that are inherent in the sport

16  (such as risks of injury from heading) or to implement concussion management protocols.

17  AYSO does not specifically argue that plaintiffs have not alleged facts showing that it

18  assumed a duty to enforce the recommendations in the concussion statements or to limit

19  risks inherent in the sport of soccer.  However, AYSO does join in US Soccer's motion to

20  dismiss.  AYSO also asserts that all members of the class who participated in its events

21  have expressly released it from liability by signing a player registration form under which

22  the player "voluntarily and willingly assumes all risks" of physical injury.

23          In opposition, plaintiffs contend that the alleged releases do not immunize AYSO

24  from liability, because the existence of any releases and whether they were actually

25  signed by the plaintiffs or their parents is a factual issue, and because the legal effect of

26  any releases in the various states at issue is unknown.  They also assert that AYSO has

27  provided no other basis for dismissal, and refer to their response to US Soccer's motion

28  with regard to assumption of the risk and lack of duty.

United States District Court
Northern District of California

1  The court finds that the facts as alleged are insufficient to support a claim of

2  voluntary undertaking against AYSO.  Plaintiffs have identified no facts in their opposition

3  that support a claim that AYSO has specifically undertaken to adopt or implement the

4  consensus guidelines drafted by the International Conferences on Sport, or to take

5  actions to eliminate risks inherent in the sport of soccer or to reduce the risk of injury from

6  improper concussion management.  Nor have plaintiffs identified facts showing that

7  AYSO specifically assumed an obligation to change the Laws of the Game or any other

8  unspecified rules pertaining to the game, or to restrict heading.

9  iv.    US Club Soccer

10  Only Mehr asserts claims against US Club Soccer.  She alleges that US Club

11  Soccer has failed to adopt any consensus guidelines promulgated by the International

12  Conferences on Concussion in Sport; and that at most, its website references a link to its

13  concussion guidelines and provides links to informational materials, but there is no

14  evidence that it implements or enforces US Soccer's concussion guidelines.  Cplt ¶¶ 344-

15  347.  She asserts that US Club Soccer's failure to require, implement, or enforce any

16  consensus best practices is a "clear breach of its duty and commitment to provide 'a safe

17  environment for its Members and participants.'"  Cplt ¶ 348.

18  US Club Soccer argues that plaintiffs' claims fail for lack of duty, although it does

19  not address the first and second causes of action separately.  Citing to US Soccer's

20  motion, US Club Soccer asserts that a defendant owes no duty to a plaintiff who is

21  allegedly injured as a result of a risk inherent in a sporting activity, and that here, plaintiffs

22  have alleged no facts showing that it owed them any legal duty to minimize risks that are

23  inherent in the sport (such as risks of injury from heading) or to implement concussion

24  management protocols.  US Club Soccer does not specifically argue that plaintiffs have

25  not alleged facts showing that it assumed a duty to enforce the recommendations in the

26  Consensus Statements or to limit risks inherent in the sport of soccer.  However, US Club

27  Soccer does join in US Soccer's motion to dismiss.  US Club Soccer also asserts that all

28  members of the class who participated in its events have expressly released it from

United States District Court
Northern District of California

liability by signing a player registration form under which the player "voluntarily and willingly assumes all risks" of physical injury.

In opposition, plaintiffs contend that the alleged releases do not immunize AYSO from liability, because the existence of any releases and whether they were actually signed by the plaintiffs or their parents is a factual issue, and because the legal effect of any releases in the various states at issue is unknown.  They also assert that AYSO has provided no other basis for dismissal, and refer to their response to US Soccer's motion with regard to assumption of the risk and lack of duty.

The court finds that the facts as alleged are insufficient to support a claim of voluntary undertaking against US Club Soccer.  Plaintiffs have identified no facts in their opposition that support a claim that US Club Soccer has specifically undertaken to adopt or implement the consensus guidelines drafted by the International Conferences on Sport, or to take any specific action to eliminate risks inherent in the sport or to reduce the risk of injury from improper concussion management.  Nor have plaintiffs identified facts showing that US Club Soccer specifically assumed an obligation to change the Laws of the Game or other unspecified rules pertaining to the game, or to restrict heading.

c.   Medical monitoring

In the third cause of action for medical monitoring, plaintiffs allege that the members of an undefined "Medical Monitoring Class" have been "exposed to a greater risk of concussions and sub-concussions, which have created an increased risk of long-term injury and illnesses as described [in the complaint]."  Cplt ¶ 446.  They assert that each defendant "should be required to establish a medical monitoring program" that includes establishing a trust fund, in an amount to be determined, to pay for the medical monitoring of all past, current, and future FIFA athletes, as frequently and appropriately as necessary; notifying all "Medical Monitoring Class" members in writing that they may require frequent medical monitoring; and providing information to treating team physicians to aid them in detecting concussions or sub-concussions and to assist them in

1   determining when the athlete is subjected to an increased risk of harm.  Cplt ¶ 450.

2       Plaintiffs bring this claim "under the laws of the states in which they reside" and

3   assert claims on behalf of "the Medical Monitoring Class" under unspecified "laws of the

4   states in which class members reside."  Since no class has yet been certified, and

5   plaintiffs' complaint provides not a clue as to which states' laws might be implicated, the

6   court looks only at the three states in which the named plaintiffs are alleged to reside –

7   California, Illinois, and Colorado.[3]

8       Defendants contend that none of the states in which the plaintiffs reside

9   recognizes an independent cause of action for medical monitoring.  They contend that

10  the California Supreme Court has affirmatively rejected the concept, and that the highest

11  courts of Illinois and Colorado have taken no position on the issue.

12      In opposition, plaintiffs assert that there is no "rule" that a cause of action has to be

13  acknowledged by a state supreme court before it can be asserted in a complaint.  They

14  argue that that they can assert a stand-alone cause of action for "medical monitoring,"

15  but also state that they agree that a reasonably certain need for medical monitoring is "an

16  item of damage for which compensation should be allowed," when liability is established

17  under traditional tort theories of liability.  They claim that it is "a distinction without a

18  difference for present purposes, at the pleading stage."

19      The motions are GRANTED.  First, California has affirmatively rejected the

20  concept.  See Lockheed Martin Corp. v. Superior Court, 29 Cal. 4th 1096, 1105 (2003).

21  "Recognition that a defendant's conduct has created the need for future medical

22  monitoring does not create a new tort.  It is simply a compensable item of damage when

23  liability is established under traditional tort theories of recovery."  Potter v. Firestone Tire

24  _____

25  [3]  Soccer is likely played in most if not all states of the United States.  Thus, even were
    the proposed class to be limited to the United States (which is not apparent from the
26  overly-broad definition in the complaint), a "medical monitoring" subclass would be
    required for the players in each state among the minority of states where "medical
27  monitoring" is recognized as a standalone cause of action.  Numerous courts have
    denied certification of medical monitoring classes or subclasses for just this reason.  See
28  In re St. Jude Medical, Inc., 425 F.3d 1116, 1122 (8th Cir. 2005) (citing cases from 6th,
    9th, and 10th Circuits).

United States District Court
Northern District of California

United States District Court
Northern District of California

1  & Rubber Co., 6 Cal. 4th 965, 1006-07 (1993); see also Xavier v. Philip Morris USA, Inc.,

2  2010 WL 3956860 at *3-4 (N.D. Cal. Oct. 8, 2010) (under California law, "medical

3  monitoring is a remedy which must rely on underlying claims," not a stand-alone tort

4  claim).

5  Second, neither the Illinois Supreme Court nor the Colorado Supreme Court has

6  addressed the issue.  Lower courts in Illinois have suggested that the Illinois Supreme

7  Court might recognize an independent claim for medical monitoring even in cases where

8  there is no present physical injury.  See, e.g., Jensen v. Bayer AG, 862 N.E. 2d 1091,

9  1100 (Ill. App. Ct. 2007).  However, to date, it does not appear that the Illinois Supreme

10  Court has done so.  In Colorado, a federal district court indicated that even assuming the

11  Colorado Supreme Court would recognize a tort claim for individualized medical

12  monitoring, the court did not believe that the Colorado Supreme Court would recognize a

13  claim for the generalized surveillance studies sought by the plaintiffs in the case before it

14  – "medical monitoring and surveillance services for the alleged 'increased risk of

15  contracting serious illnesses.'"  See Satsky v. Paramount Commc'ns, Inc., 1996 WL

16  1062376 at *5 (D. Colo. March 13, 1996).  This type of claim for "enhanced risk of future

17  harm," see id., is similar to what plaintiffs are seeking here.

18  Plaintiffs can still include their request for medical monitoring in the prayer for

19  relief, assuming they can allege facts sufficient to establish standing.

20  **CONCLUSION**

21  In accordance with the foregoing, defendants' motions are GRANTED.

22  1.     FIFA's motion to dismiss for lack of personal jurisdiction is GRANTED.

23  Because the court finds that amendment would be futile, FIFA is dismissed from the

24  action WITH PREJUDICE.

25  2.     Having dismissed FIFA for lack of personal jurisdiction, the court finds it

26  unnecessary to rule on FIFA's motion to dismiss for failure to join IFAB, a necessary

27

28

United States District Court
Northern District of California

1  party.[4]  US Soccer, USYSA, and CYSA joined in FIFA's motion, but in the absence of

2  both FIFA and IFAB, no claim can be maintained which seeks to change the FIFA Laws

3  of the Game.

4          3.      FIFA's alternative motion to compel arbitration is DENIED.

5          4.      Defendants' motions to dismiss the complaint for lack of standing are

6  GRANTED.  The dismissal is with leave to amend, but only to the extent that plaintiffs

7  can allege – as to each plaintiff and each defendant – specific facts supporting the

8  elements of standing (injury, causation, redressability).  Further, the motions to dismiss

9  the claims for relief for lack of standing are GRANTED.  The dismissal is with leave to

10  amend, with the exception of the claims for prospective injunctive relief brought by the

11  plaintiffs who are no longer eligible to play youth soccer (to date – Mehr, Akka-Seidel,

12  and L.L.M.)

13          5.      Defendants' motions to dismiss for failure to state a claim are GRANTED as

14  follows:

15          a.      CYSA's motion is GRANTED, on the basis that no plaintiff asserts a

16  claim against CYSA.  The dismissal is WITH LEAVE TO AMEND, but only to the extent

17  that there is a California plaintiff who has standing to assert a claim against CYSA.

18          b.      The motions of US Soccer, USYSA, AYSO, and US Club Soccer to

19  dismiss the first cause of action for negligence are GRANTED.  The dismissal is WITH

20  LEAVE TO AMEND, but only to the extent that plaintiffs can allege some legally

21  cognizable duty, and can allege facts showing that each defendant breached that duty,

22  and caused injury to a particular plaintiff.

23  _____

24  [4]   Under Federal Rule of Civil Procedure Rule 12(b)(7), the court can dismiss an action if
the plaintiff has failed to join a "required" party under Rule 19.  See Schwarzer, Tashima

25  & Wagstaffe, Federal Civil Procedure Before Trial (2015 ed.) § 9:162.  The failure to join
a party under Rule 19 will lead to dismissal of a suit where the court cannot obtain

26  jurisdiction over the necessary party and that party is determined to be indispensable to
the action.  See Fed. R. Civ. P. 19(a); Disabled Rights Action Comm. v. Las Vegas

27  Events, Inc., 375 F.3d 861, 867 n.5 (9th Cir. 2004); see also Shermoen v. United States,
982 F.2d 1312, 1317 (9th Cir. 1992); Makah Indian Tribe v. Verity, 910 F.2d 555, 558 (9th

28  Cir. 1990).

       c.      The motions of US Soccer, USYSA, AYSO, and US Club Soccer to dismiss the second cause of action for voluntary undertaking are GRANTED.  The dismissal is WITH LEAVE TO AMEND, but only to the extent that plaintiffs can allege facts as to each defendant showing that the defendant voluntarily assumed a duty with respect to a specific plaintiff or plaintiffs.

       d.      The motions to dismiss the third cause of action for medical monitoring are GRANTED.  As the court finds that amendment would be futile, the dismissal is WITH PREJUDICE.

    6.      Any amended complaint shall be filed no later than August 17, 2015.  No new claims or new parties may be added without leave of court.

**IT IS SO ORDERED.**

Dated:  July 16, 2015

_____
PHYLLIS J. HAMILTON
United States District Judge

46